JOHN P. CALLAGHAN, petitioner,

*v.*

ANNA CALLAGHAN, defendant.

[Decided June 9th, 1924.]

**Divorce—Adultery—Master's Report That Charge Was Not Proven Not Sustained.**

On petition for divorce. On exceptions to master's report.

*Miss Paula Laddey,* for the petitioner.

FOSTER, V. C. (orally).

Exceptions have been taken to the divorce report of the special master in this case, and particularly to that portion of it in which the master reports that "it is not proven to his satisfaction that the defendant, since her marriage to the petitioner, and on the 30th day of May, 1923, committed adultery with Duke Schiller at a hotel conducted and operated by Patrick J. Kane, of Keansburg, New Jersey. The petitioner has attempted to prove this charge by Patrick J. Kane. I have carefully examined the testimony of the said Patrick J. Kane, and I am not convinced that he is telling the truth."

The master does not give any reason for his conviction that Mr. Kane is not telling the truth, nor does he refer to the fact that in some of his testimony Mr. Kane is corroborated by the testimony of his wife. Mr. Kane is the uncle, by marriage, of the defendant. He testifies that on the 29th day of May, 1923, the defendant, accompanied by the said Duke Schiller, came to his hotel; that Schiller, at the solicitation of the defendant, decided to remain over night at the hotel, upon the promise by Kane that he would call him at six o'clock in the morning, in order that he might go to his work.

Kane states that, to accommodate the defendant, he gave up his room with his wife, and that Mrs. Kane and Mrs. Callaghan occupied the same room and bed, while he occupied a room some distance away from them, known as No. 14. The room occupied by Mrs. Kane and Mrs. Callaghan being No. 12. Mr. Kane testifies that on the morning of May 30th he went in the room occupied by Schiller at six o'clock in the morning, for the purpose of awakening him, and found Mrs. Callaghan in bed with Schiller; that he aroused Schiller, but did not awaken Mrs. Callaghan, but he was indignant and went back to his room and reported what he had seen to his wife. In about twenty minutes he again returned to the room occupied by Schiller, and found Schiller and Mrs. Callaghan in the act of adultery, and that he returned and reported what he had seen to his wife. Mrs. Kane, the defendant's aunt, corroborates him, and states that she and the defendant retired together about one o'clock in the morning; that Mrs. Callaghan was in bed with her when Mrs. Kane went to sleep, and that when Mr. Kane aroused her in the morning about six o'clock, she found that some time during the night Mrs. Callaghan had left her bed and left the room, and that shortly after Mr. Kane had informed her of what he had seen in Schiller's room, Mrs. Callaghan came back in Mrs. Kane's room and dressed herself with the clothing that she had taken off there the night before, and that neither she nor Mrs. Kane made any reference to what the husband testified he had seen in Schiller's room, and neither Kane nor his wife made any mention of the matter to Mr. or Mrs. Callaghan, or to anyone else, until the following August. There is testimony in the case that Mrs. Callaghan has neglected her child, a boy of tender years; that she has been intoxicated, and that she was found in a restaurant in Greenwich village, known as Mori's, in an intoxicated condition; that she introduced a man named Schmidt (later known as Malvin), who was also under the influence of liquor, as her sweetheart; that she left her husband, with his permission, to visit a friend, presumably a lady, in Baltimore, for ten days, and remained there for six weeks, and that

there was, subsequently, discovered in her pocketbook telegrams and letters addressed to her by one Arthur Malvin, from Baltimore, together with a photograph of Malvin, who was identified as the man who was in defendant's company at the Mori restaurant, and to whom she referred as her "sweetheart."

I find nothing in the record to justify the action of the master in refusing to believe or accept the testimony of Mr. or Mrs. Kane. No reason, as I state, has been assigned by him for his refusal to believe Kane's testimony to be true, and in the absence of any contradiction or any circumstance that would indicate it to be untrue, I think it should be accepted as a verity, particularly in view of the relationship between Mr. and Mrs. Kane and the defendant.

I will therefore advise that the exceptions be sustained and that a decree be granted to the petitioner.